**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| **LENA BRANDS LLC**, *et al.*,[1] | Case No. 26-10792 (TMH) |
| Debtors. | (Joint Administration Requested) |
| | **Re: D.I. Nos. 3, 5, 6, 7, 8, 9, and 10** |

**DECLARATION OF SAMUEL NICHOLAS BORGESE IN SUPPORT OF CHAPTER 11
PETITIONS AND FIRST DAY PLEADINGS**

I, Samuel Nicholas Borgese, hereby declare under penalty of perjury as follows:

1.       I am the sole member of Lena Brands, LLC ("**Lena Brands**"), and its subsidiaries, the debtors and debtors in possession (the "**Debtors**") in the above-captioned bankruptcy cases (the "**Chapter 11 Cases**"). I submit this declaration in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on May 15, 2026 (the "**Petition Date**") and the relief requested pursuant to the Debtors' applications and motions filed contemporaneously herewith (collectively, the "**First Day Motions**").

2.       I have more than 30 years of senior executive and leadership experience in the restaurant, retail, hospitality, and technology sectors. From 2017 to 2023, I served as President and Chief Executive Officer of Shari's Management Corporation, the largest full-service family dining chain based in the Pacific Northwest. From 2014 to 2016, I served as President and Chief Executive Officer of LRI Holdings, Inc. and its subsidiary, Logan's Roadhouse, Inc., a casual-dining

---

[1] [1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal employer identification number, are: Lena Holdings LLC (6569); Lena Brands LLC (3815); and Lena Real Estate Holdings LLC (1167). The Debtors' mailing address is 13745 Omega Road, Dallas, Texas 75244.

steakhouse chain with more than 230 company-operated and 26 franchised restaurants across 23 states. From 2011 to 2014, I served as Chief Executive Officer of Max Brenner International, a global chocolatier restaurant concept. From 2008 to 2011, I served first as Interim President and Chief Executive Officer and then as permanent President and Chief Executive Officer of CB Holding Corp., the parent company of Charlie Brown's Steakhouse, Bugaboo Creek Steak House, and The Office Beer Bar & Grill, which was owned by Trimaran Capital Partners. Prior to CB Holdings from 2003 until 2008 I served as President and Chief Executive Officer of Catalina Restaurant Group, parent to the Coco's Restaurant & Bakery and Carrows family-dining concepts, with more than 360 locations in the Southwestern United States.  From 2011 until 2026 I also served as Executive Chairman of the Board of Directors of El Pollo Loco, Inc., as an independent director on the board of El Pollo Loco Holdings, Inc. During my time as an EPL Board member I served as Chairman of the Governance & Nominating, ESG, and Audit Committees.   I attended Temple University's Architecture and Engineering school and hold a Certificate of Director Education from the National Association of Corporate Directors and a Certification of Completion from the Harvard Business School Executive Education Program.

3.      I am familiar with the Debtors' operations, business affairs, and circumstances leading to these Chapter 11 Cases. Unless otherwise indicated, all facts set forth in this declaration are based on (a) my personal knowledge of the Debtors' business operations and finances or my review of relevant documents, (b) information received from persons working under my supervision or direction, the Debtors' management team, or the Debtors' advisors, or (c) my opinion based upon my experience and extensive background in the restaurant industry. If called upon to testify, I would testify competently to the facts set forth herein.

**I**

## SUMMARY

4.      It is my understanding that Coco's Bakery Restaurant traces its origins to a small restaurant opened in 1948 along Pacific Coast Highway in Orange County, California, and later developed into a Western United States family-dining and bakery concept known for traditional American meals and fresh-baked pies. I understand that Shari's began in 1978 in Hermiston, Oregon, as a family-dining concept associated with comfort food, pies, and a distinctive regional footprint in the Pacific Northwest and western states. Coco's and Carrows subsequently became related family-dining brands under common ownership, including through Catalina Restaurant Food Management Partners, and later, Gather Intermediate Holdco LLC ("**Gather**").[2] On or about October 17, 2024, Lena Holdings LLC purchased the Shari's and Coco's restaurant operations from Gather (assignment for the benefit of creditors), LLC (the "**Gather Assignee**"), as assignee for the benefit of Gather's creditors (the **"ABC Transaction"**).

5.      The Debtors now operate approximately a 11 family-dining restaurants under the Shari's and Coco's brands in California, Washington, and Idaho. The Debtors employ approximately 235 individuals at these restaurant locations and support centers in Oregon and Texas.

6.      The Debtors include Lena Holdings LLC ("**Lena Holdings**"), Lena Brands LLC ("**Lena Brands**"), and Lena Real Estate Holdings LLC ("**Lena Real Estate**"). I own 100% of Lena Holdings, which serves as the holding company for the Debtors' restaurant enterprise. Lena Holdings owns 100% of each of Lena Brands and Lena Real Estate. Lena Brands is the operating company for the Shari's Restaurants and Coco's Bakery Restaurants business, and Lena Real

---

[2]     Since 2022, through Gather Holdings, LLC, I indirectly hold 100% of the assets of Gather, an entity that has no operations or assets following the assignment to Gather Assignee.

3

Estate is the real estate and leasing entity for the Debtors' leased restaurant locations. The Debtors' restaurant locations are leased rather than owned.

## II

## PREPETITION CAPITAL STRUCTURE

**1.     Libertas Funding (First-Priority Secured Creditor)**

1.     To the best of my recollection, and based on my review of the Debtors' books and records, in connection with the 2024 ABC Transaction, as noted above, Lena Holdings LLC assumed approximately $462,000 ?? See email from Katherine Fonesca in outstanding obligations owed by Gather to two Libertas-affiliated funds. I understand that those assumed obligations were evidenced by two Delaware UCC financing statements filed on **September 18, 2024**, against Lena Holdings LLC, which covered accounts, payment intangibles, letter-of-credit rights, rights to payment, related records, and proceeds. On March 26, 2025, Libertas entered into an *Agreement of Sale of Future Receipts* with each of the Debtors pursuant to which Libertas purchased $1,716,000 of future receipts for a purchase price of $1,300,000, with a specified percentage of 3.90% and an initial weekly delivery amount of $29,184. I am informed and believe that the March agreement included reconciliation and adjustment rights, prohibited the Debtors from selling Future Receipts or obtaining additional financing before Libertas received the full completion amount without Libertas's written consent, and granted Libertas a security interest in accounts, payment intangibles, letter-of-credit rights, rights to payment, related records, and proceeds. It is my understanding that, concurrently with that transaction, on March 28, 2025, Libertas filed a UCC financing statement against each of the Debtors covering accounts, receivables, and general intangibles (the "**Libertas Collateral**").

2.      To the best of my recollection, and based on my review of relevant records, on or about July 30, 2025, Libertas rolled the prior obligations under the March 2025 agreement and other obligations, including certain obligations owed to WebBank, into a new *Agreement of Sale of Future Receipts* (the "**Libertas Agreement**") with Lena Holdings LLC, *et al.*, providing for an amount sold of $2,192,520, a purchase price of $1,661,000, a specified percentage of 7.75%, and an initial weekly delivery amount of $47,457. I understand that, contemporaneously, on **August 4, 2025,** Libertas filed a UCC financing statement against each of the Debtors covering the Libertas Collateral. Based on my review of the Libertas Agreement, it is my understanding that the Libertas Agreement grants Libertas Article 9 rights in accounts, payment intangibles, rights to payment, related records, and proceeds, and contains anti-stacking provisions prohibiting the Debtors from selling, transferring, or encumbering Future Receipts or obtaining additional short-term receivables-based or ACH-based financing without Libertas's written authorization.

3.      Based on my review of relevant records, the total outstanding balance of the Libertas Agreement as of the Petition Date is approximately $1,661,000. I have been informed and believe that, for purposes of these Chapter 11 Cases and the requested cash collateral relief—subject to negotiation of final terms and satisfactory documentation—Libertas has agreed that the Libertas Agreement shall be characterized as a secured financing obligation, and Libertas's claims against the Debtors shall be treated as secured claims to the extent of the value of the Libertas Collateral. Based on the information available to me, I presently estimate the Libertas Collateral as of the Petition Date at approximately $650,000, comprised primarily of the frozen Stripe balances described belowand subject to final reconciliation of the amounts held by Stripe, DoorDash, and GrubHub. That estimate is consistent with prepetition communications and lien reports in the Debtors' records reflecting third-party delivery receivable holds, together with

additional asserted holds and amounts identified by the Debtors in the weeks before the Petition Date. Based on those estimates, I understand that the estimated value of the Libertas Collateral is substantially less than the approximately $1.661 million Libertas secured claim. I also understand, based on the same estimates and records, that the Debtors do not currently identify excess value in the Libertas Collateral to support cash adequate protection payments, an equity cushion, or a superpriority administrative expense claim for junior receivables claimants. It is my understanding that the proposed Adequate Protection Liens and Superpriority Claim are intended to protect Libertas against any actual post petition diminution in the value of its valid interest in Cash Collateral, while preserving the Carve-Out, Excluded Assets, section 552(b)(1) tracing issues, and all timely Challenge rights.

**2.      Junior MCA Parties**

4.      To the best of my knowledge, based on my review of relevant records in the Debtors' possession, from May through October 2025, the following nine parties (the "**Junior MCA Parties**") entered into separate agreements with the Debtors, each purporting to purchase a percentage of the Borrowers' future receivables in exchange for an upfront purchase price:

- Fox Funding Group LLC
- Thoro Corp
- Green Note Capital Partners SPV, LLC ("**Green Note**")
- Immediate Capital Solutions LLC
- Cromwell Capital LLC
- SQ Advance
- G&G Funding Group LLC
- Riverside Capital NY, and
- Cedar Advance LLC

To the best of my understanding, based on my review of relevant records in the Debtor's possession, the total outstanding balance owed to these nine Junior MCA Parties is approximately $3.034 million.

5.     It is my understanding and belief that five of the Junior MCA Parties filed or caused to be filed UCC-1 financing statements purporting to secure accounts, receivables, payment rights, and proceeds. I am informed and believe that two of these financing statements were filed by CT Corporation System, as representative, and cannot be conclusively tied to a specific Junior MCA Party.

6.     Based on my review of relevant records, I understand that the Junior MCA agreements are styled as purchases of future receivables and contain features such as: (a) fixed repayment obligations requiring the Debtors to remit specified dollar amounts irrespective of actual receivables collected, with certain agreements imposing daily or weekly ACH debits of fixed sums; (b) personal guarantees by me, as the Debtors' principal; (c) reconciliation provisions that have not been exercised; and (d) UCC-1 financing statements filed by or on behalf of the Junior MCA Parties expressly granting security interests in accounts, proceeds, and other collateral.

**3.     Other Secured Parties: US Foods, Inc.**

7.     In my recollection, and based on my review of relevant records, Lena Brands LLC executed a credit application with US Foods, Inc. ("**US Foods**") on or about December 11, 2024, which was approved for a $20,000 credit line on net 14-day ACH terms and granted US Foods a security interest in substantially all of Lena Brands LLC's existing and after-acquired personal property, including accounts, goods, inventory, proceeds, and products thereof. The Debtors' books and records reflect that, in February 2025, US Foods and Lena Holdings LLC entered into a three-year Master Distribution Agreement. It is my understanding and belief that US Foods filed a UCC financing statement against Lena Brands LLC on August 26, 2025, which included the assertion of a security interest against inventory. On February 24, 2026, Lena Holdings LLC and Lena

7

Brands LLC executed a promissory note in favor of US Foods in the original principal amount of $729,827.62 on account of goods and services delivered and invoiced on or before November 21, 2025, and acknowledging the security interest granted in the credit application. Based on my information and belief, as well as my review of the Debtors' books and records, the amount outstanding as of the Petition Date was approximately $715,301.00.

**III.**

**EVENTS LEADING UP TO THE CHAPTER 11 FILINGS**

8.      I authorized and directed the Debtors to commence these cases because their debt burden had become unsustainable, deprived the business of needed liquidity, and diverted management attention from operations.

9.      Based on my recollection, my review of relevant records, and my knowledge of the Debtors' finances, in connection with the ABC Transaction, the Debtors assumed significant liabilities, including approximately $1.5 million in past due rent obligations, approximately $1.45 million in sales tax liabilities, and certain outstanding obligations to two funds affiliated with Libertas Funding, LLC ("**Libertas**"). To fund these obligations and support ongoing operations, the Debtors obtained funding from Libertas and other merchant cash advance (**"MCA"**) lenders. Based on my knowledge of the Debtors' finances, the MCA burden grew to approximately $5.16 million across roughly ten funders (including Libertas). In my view, the resulting balance-sheet constraints ultimately necessitated the commencement of these Chapter 11 Cases.

10.      The Debtors derive a significant portion of their revenue through third-party delivery platforms, including GrubHub and DoorDash. For a number of months prior to the Petition Date, I and the Debtors management team had been addressing third-party delivery receivable holds triggered when two Junior MCA Parties—Thoro Corp and Immediate Capital

Solutions LLC—filed UCC financing statements not only against the Debtors but also against Stripe, Inc. ("**Stripe**"), the payment processor for GrubHub and DoorDash, purporting to encumber payments to the Debtors that were held at Stripe. As of the Petition Date, Stripe has frozen roughly $650,000 in disbursements to the Debtors, materially restricting a critical cash-flow stream and contributing to the need for an expedited bankruptcy filing by the Debtors. I am informed and believe that the frozen funds constitute property of the Debtors' estates under section 541 of the Bankruptcy Code and Cash Collateral. I understand that, to recover these estate assets, the Debtors are preparing to commence an adversary proceeding seeking turnover under section 542 of the Bankruptcy Code and related emergency relief, including, as appropriate, expedited consideration of a request for temporary restraining order or preliminary injunctive relief under Bankruptcy Rule 7065.

11.     I authorized and directed the Debtors to commence these Chapter 11 Cases to address MCA obligations in a controlled forum and to implement a five-year payment plan with respect to certain past due priority tax claims pursuant to the Bankruptcy Code, with the goal of emerging from bankruptcy with a restructured balance sheet and a sustainable go-forward financing structure. Over the past week, as the Debtors' management team and I have begun to shift our attention from the Debtors' overwhelming prepetition debt burden and the daily issues posed by collection actions, we have identified opportunities to reduce insurance costs, identified potential insurance refunds, and transitioned to a payroll service with robust controls around the payment of payroll taxes. With the protection of the Court, I believe the Debtors can continue the process they have started of improving cash flow, streamlining operations, and reshaping their footprint, operations, and capital structure for growth.

IV.

THE NEED FOR CASH COLLATERAL

12.     The Debtors' cash collateral is the day-to-day operating cash that keeps the Shari's and Coco's restaurants open. In the ordinary course, the Debtors collect revenue from restaurant sales and third-party delivery platforms and then use those receipts to fund payroll, food and beverage purchases, rent, utilities, insurance, sales taxes, bank fees, and other restaurant-level expenses. I prepared the 20-week cash flow forecast attached to the proposed cash collateral order, and it reflects eleven operating stores and projected weekly inflows, consisting primarily of restaurant revenue collections. In my experience, and based on my knowledge of the Debtors' operations and liquidity needs, I believe the Debtors need to this cash to continue operating their restaurants, preserve going-concern value, and fund these Chapter 11 Cases. Based on my knowledge of the Debtors' operations, and my experience managing restaurant businesses, I believe that without authority to use cash collateral the Debtors would face immediate and material disruption to payroll, vendor payments, taxes, insurance, utilities, and other essential expenditures and would have no practical ability to operate during the interim period.

13.     The Debtors propose to use cash collateral solely in accordance with a 20-week cash flow forecast attached to the interim cash collateral order. The budget reflects the Debtors' anticipated receipts and disbursements during the 20-week period commencing on the Petition Date. Based on my knowledge of the Debtors' operations, I believe that, with the use of cash collateral and the turnover of the receivables currently held at Stripe, the Debtors have sufficient liquidity to fund ongoing business operations and administrative expenses. Without authority to use cash collateral, I believe the Debtors risk losing hourly restaurant employees, interrupting food

and supply deliveries, disrupting tax and payroll compliance, and impairing their ability to keep restaurants open for customers.

14. Based on my understanding of the Debtors' potential turnover claims and the amount of receivables currently held at Stripe, I believe prompt consideration of the Debtors' efforts to obtain turnover is important to the Debtors' liquidity. To protect against delay or litigation risk, I am also currently in active discussions with multiple parties regarding a $400,000 debtor-in-possession facility. If the Debtors are unable to obtain that facility on acceptable terms and within the necessary timeframe, I may, if necessary and subject to appropriate documentation and Court approval, to provide a capital infusion myself to bridge the funding need and prevent the loss of going-concern value during the interim period.

15. In my judgment, authorizing the Debtors to use cash collateral while they seek recovery of the receivables held at Stripe and while I arrange for financing as a backstop would allow the Debtors to convert ordinary-course restaurant receipts into estate-preserving expenditures. I believe that authority would permit the Debtors to keep restaurants operating, retain employees, maintain vendor relationships, preserve customer confidence, and continue pursuing recovery of the frozen third-party delivery receivables. I also believe continued operations preserve the revenue base that supports the value of the Debtors' estates and the collateral asserted by secured parties.

16. In my judgment, the requested authority to use cash collateral is necessary and appropriate because it would permit the Debtors to fund ordinary-course operations, preserve employee and vendor relationships, maintain restaurant operations, address the risk of immediate harm during the critical first weeks of these Chapter 11 Cases, and pursue a value-preserving restructuring in these Chapter 11 Cases.

11

**V**

**THE FIRST DAY MOTIONS**

17.     I understand that, contemporaneously with the filing of this Declaration, the Debtors have filed the following "first day" motions to minimize the disruption and adverse effects of the commencement of these Chapter 11 Cases on the Debtors' operations and to preserve value for their estates and all stakeholders.

    a.  **Joint Administration.** *Motion for Joint Administration*

    b.  **Cash Collateral.** *Motion to Approve Use of Cash Collateral / Motion of the Debtors for Entry of Interim and Final Orders Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. 361 and 363, Scheduling a Final Hearing, and Granting Related Relief Filed By Lena Brands LLC*

    c.  **Cash Management.** *Motion to Maintain Bank Accounts / Debtors Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Perform Intercompany Transactions, and (D) Maintain Existing Business Forms; (II) Authorizing the Debtors Banks to Honor All Related Payment Requests; and (III) Granting Related Relief Filed By Lena Brands LLC*

    d.  **Employee Obligations.** *Debtors Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Payroll, (B) Continue Employee Benefits, and (C) Pay Prepetition Employee Benefit Obligations; (II) Authorizing Banks to Honor Related Payment Requests; and (III) Granting Related Relief*

    e.  **Utilities.** *Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b) / Debtors Motion for Entry of Interim and Final Orders (I) (A) Approving the Debtors Proposed Form of Adequate Assurance of Payment for Future Utility Services, (B) Approving the Debtors Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services; and (II) Granting Related Relief Filed By Lena Brands LLC*

    f.  **Claims and Noticing Agent.** *Application to Appoint Claims/Noticing Agent Omni Agent Solutions*

    g.  **Creditor Matrix.** *Motion Regarding Chapter 11 First Day Motions / Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File and*

*Maintain Consolidated Creditor Lists, (B) File a Consolidated List of the Debtors' Twenty Largest Creditors, (C) Redact Certain Personal Identification Information for Individual Employees, and (D) Authorize Service on Employees Through Company Distribution Channels and (II) Granting Related Relief*

18.     I understand that the First Day Motions request authority to: jointly administer the Debtors' Chapter 11 Cases; use cash collateral to fund ordinary-course operations and these cases; maintain the Debtors' cash management system, bank accounts, payment channels, intercompany transactions, and existing business forms; pay prepetition payroll, continue employee benefits, and satisfy related employee obligations; provide adequate assurance for utility services and establish procedures for resolving utility-provider requests; appoint Omni Agent Solutions as claims and noticing agent; and file and maintain consolidated creditor lists, redact certain personal identifying information for individual employees, and authorize service on employees through company distribution channels. I understand that the Debtors request authority, but not direction, to incur indebtedness, pay amounts, or satisfy obligations with respect to the relief requested in the First Day Motions.

19.     In my experience and based on my knowledge of the Debtors' operations, I believe prompt first day relief is needed to preserve the Debtors' restaurant operations. The Debtors must maintain their cash management system, continue using bank accounts and payment channels, protect utility services, administer creditor noticing efficiently, and obtain authority to use cash collateral to fund payroll, vendors, taxes, insurance, utilities, and other necessary expenditures.

20.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) listed above. To the best of my knowledge, the facts set forth in the First Day Motions are true and correct, and if called upon to testify, I could and would testify competently to such facts.

21.    The Debtors request authority, but not direction, to pay amounts, satisfy obligations, or take actions with respect to the relief requested in the First Day Pleadings. Based on my review of the First Day Motions and my knowledge of the Debtors' operations, I believe the requested interim relief is tailored to the Debtors' immediate operational needs, including circumstances in which the requested payments would otherwise be entitled to priority over general unsecured claims under the Bankruptcy Code. I believe the relief sought in the First Day Motions would help the Debtors avoid disruption to operations, preserve the value of the Debtors' estates, and maintain relationships with creditors, employees, vendors, customers, and other stakeholders during the early stages of these Chapter 11 Cases.

## CONCLUSION

22.    For the reasons described in this Declaration and in the First Day Pleadings, I respectfully request that the Court approve the use of cash collateral and grant the relief requested in the First Day Pleadings, together with such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: May 19, 2026

/s/ Sam Borgese
Samuel Nicholas Borgese
Sole Member of the Debtors

14